**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------

| | | |
|---|---|---|
| Sharon Mahn, | : | |
| | : | Docket No.: 24-08326 |
| Plaintiff, | : | |
| -against- | : | |
| | : | |
| Allegis Group, Inc. and Major, Lindsey & | : | **VERIFIED COMPLAINT AND** |
| Africa, LLC, | : | **DEMAND FOR JURY TRIAL** |
| | : | |
| Defendants. | : | |

---------------------------------------------------------x

Plaintiff Sharon Mahn ("Ms. Mahn"), by and through her attorneys, Brazzano Law

PLLC, as and for her Verified Complaint, alleges as follows:

NATURE OF THE ACTION

1.     Beyond the facade of a legitimate legal dispute, Ms. Mahn finds herself the sole

target of a vindictive smear campaign, one meticulously engineered to not only defeat Ms. Mahn

but to dismantle her well-being, personally, professionally, reputationally, financially, and

spiritually.

2.     The notion that private corporate behemoths, Allegis,[1] and its acquired

instrumentality entity Major, Lindsey & Africa, under the command of their billionaire arrogant

overlord owners James C. Davis, and formerly, and during the relevant time frame, Stephen J.

Bisciotti have, through their troupes of lawyers, orchestrated an incessant and unprecedented

fifteen-year legal pursuit of Ms. Mahn, which persists relentlessly with no sign of abating, that

defies any logic or sense of legal stratagem.

3.     The iconic imagery of Lady Justice, with her blindfold denoting impartiality,

---

[1] Allegis Group, Inc. ("Allegis") and Major, Lindsey & Africa, LLC ("Major, Lindsey & Africa,"
together with Allegis, "Defendants").

epitomizes a domain where justice holds sway – but she is not blind to the injustice wielded by Defendants (and their minions, non-parties here) who have abused her system for improper purposes outside of any legitimate basis in law and who have defamed Ms. Mahn with malicious intent.

4.      Justice may progress at a measured pace, but its course is set, and Ms. Mahn will no longer be silenced or intimidated by powerful, privately held goliath entities and their honorless tycoons, who have hunted her relentlessly, like human prey.

5.      The Defendants, and their owners and agents, have systematically misused their colossal wealth and undeserved power to obscure the harrowing reality and torment that they have unlawfully wielded against Ms. Mahn.

6.      This lawfare, fueled by the Defendants' sinister intent to inflict maximum torment upon Ms. Mahn, has shamelessly paraded her suffering for public spectacle through Defendants' unabashed media pandering and manipulation to disguise their own menacing and abusive conduct in their stated intent to destroy and bankrupt Ms. Mahn, as threatened by Defendants' agent, Jeffrey Reichert ("Reichert"), in November 2009.

7.      Defendants will, as is their well-documented pattern and practice, seek to camouflage their shameful and unlawful conduct directed at Ms. Mahn under the cloak of a perpetual arbitration clause, as they reach for the dark veil of forced arbitration, but they will fail.

8.      Defendants stand on no legitimate legal ground to defame Ms. Mahn or abuse the civil process; their conduct and purpose remain indefensible.

9.      Defendants can proudly proclaim that the threat issued by Allegis' in-house lawyer, Reichert, on November 19, 2009 when he traveled from Allegis' Maryland enclave to New York City and threatened Ms. Mahn that they (being Allegis and Major, Lindsey & Africa) would

"destroy" her and "bankrupt" her, has come to fruition as meticulously planned by Defendants in ultimately forcing Ms. Mahn into bankruptcy as she could not fund the lawless arbitration award and judgment that Major, Lindsey & Africa obtained.

10.    Though Ms. Mahn's employment lasted only four years, Defendants have waged a 15-year vendetta of relentless, malevolent actions against her, weaponizing arbitration and litigation, in their relentless hunt.

11.    Defendants' authorized agent and counsel, Patrick L. Kenney, Esq. of the Shook, Hardy & Bacon L.L.P. firm, complained in October 2020 (a full decade after Ms. Mahn left) writing that Ms. Mahn was building "a competitive business," essentially trying to fabricate an everlasting non-compete to prevent Ms. Mahn, who is one of the top legal recruiters in the world, from earning a living.

12.    Defendants, upon information and belief, combined have literally billions of dollars of gross income, yet they continued to whine that Ms. Mahn, a solo legal recruiter, is jeopardizing their perpetual revenue stream 15 years after her departure.

13.    Kenney advised in his October 2020 missive, on behalf of Defendants, that "Mahn needs to get a loan and make a lump sum offer that will make MLA decide that it can let this go. Otherwise, it is likely that every dollar of profit Mahn earns for the rest of her working life will be going to MLA to satisfy the $4 million judgment against her."

14.    What began as a spurious $236,000 dispute in arbitration ballooned as Major, Lindsey & Africa tacked on excessive attorneys' fees and arbitrator styled and imposed punishment. Then, leveraging New York's court interest rate (a rocketing 9%), they escalated the claim to the multi-million dollar amount they now demand in Ms. Mahn's bankruptcy proceeding.

15.    Ms. Mahn's initial fear of both Reichert himself and his menacing threats, which

were based upon Defendants' harmful intent and an illegitimate collateral objective, ruining Ms. Mahn financially and publicly, and stated intent to destroy her life, were all well founded.

16.     Defendants' collective mission extended beyond abusively annihilating Ms. Mahn's life; it aimed to divert attention from their own illicit dealings with competitors, employees, lawyers, and law firms.

17.     Defendants' actions here are a stark reminder of the callous disregard for integrity and abuse of the civil legal process, as they continue their outdated and tone-deaf treatment of successful women, like Ms. Mahn.

18.     Defendants have engaged in an unwavering campaign against Ms. Mahn, fueled by the inexhaustible coffer of their fortunes, in collaboration with their owners, agents, and individual non-parties identified herein.

19.     It defies comprehension that Allegis and Major, Lindsey & Africa, upon information and belief, now wholly owned and run by Davis, with an estimated net worth north of $4.1 billion in 2024 (and formerly owned by both Davis and Bisciotti) under the shade of Allegis, a private entity worth more than $15 billion have directed their ensemble of lawyers to pursue Ms. Mahn, a solitary former employee, for more than 15 years, under the auspices of any legitimate legal dispute.

20.     When Ms. Mahn made the decision to seek justice, then acting through her Bankruptcy Trustee, in the matter now captioned *Sharon Mahn v. Lawrence N. Mullman, Major, Lindsey & Africa, LLC and Laurie Ann Caplane,* Index No.: 952263/2023  (the "New York Action"), filed in the New York State Supreme Court, New York County, on November 21, 2023 for the sexual assault and sexual battery she suffered as the direct result of the unlawful conduct of Lawrence N. Mullman ("Mullman"), and other claims against Major, Lindsey & Africa,

Jonathan Austn Lindsey ("Lindsey") and Laurie Ann Caplane ("Caplane"), Major, Lindsey & Africa, through its agents, attempted to deflect their unlawful conduct by defaming Ms. Mahn, attempting to shame and silence her as the victim of a sexual assault.[2]

21.     Defendant, Major, Lindsey & Africa, acting with malice and intent has defamed Ms. Mahn, when its spokesperson offered a public comment for inclusion and publication about the New York Action in an ALM Law.com article published on November 22, 2023, stating "as her bankruptcy case reaches the court, and the risk that she may be forced to repay the millions of dollars she *stole* from MLA and her colleagues becomes real" (*emphasis* added).[3] Defendants know, without question, that Ms. Mahn has a spotless record, never once facing criminal charges in her life.

22.     Major, Lindsey & Africa's statement is deliberately false, literally unprovable, and defamatory *per se;* Ms. Mahn has never, ever, been accused of stealing a dollar, let alone "millions of dollars."

23.     Further, in Major, Lindsey & Africa's desperate scamper to force Ms. Mahn to arbitrate claims sounding in sexual assault and sexual battery, Defendants defamed Ms. Mahn, falsely claiming that "MLA wanted to recover the damages it suffered due to Mahn's *criminal conduct*" (emphasis added).[4]  Defendants are fully aware, once again, that no criminal charges have ever been levied against Ms. Mahn.

24.     Defendants' statement was and is intentionally false, an unprovable lie, and defamatory *per se.*

---

[2] While Ms. Mahn was successful in defeating the New York defendants from dismissing her sexual assault and sexual battery claims, among others, the New York Court's decision that those claims must be heard in a secret forced arbitration is on appeal to the New York State Court, Appellate Division, First Department, Docket No.: 2024-03039.
[3] *See*, Justin Henry, *Major, Lindsey & Africa Leaders Turned Blind Eye to Sexual Assault, Suit Alleges,* The American Lawyer (November 22, 2023, published at 12:36 PM).
[4] *See*, New York Action, Dkt. 67, p. 4, March 11, 2024.

25.     Defendants' improper purpose in spewing defamatory lies is not cloaked under any litigation privilege; a lie can never be pertinent, or relevant, or material.

26.     Defendants have collectively engaged in actions that constitute an unlawful abuse of process, including issuing threats against Ms. Mahn, disturbing demands to take her elderly father's deposition to collect their inflated "debt," serving unlawful *subpoenas*, and repeatedly threatening to obtain *in terrorem* sanctions against her, stalked her online, admonished her for posting on Facebook about Major, Lindsey & Africa and threatened to file baseless sanctions against her five times during a four-hour deposition, improperly froze her simple employee pension account, among other unlawful and abusive conduct detailed herein.

27.     Major Lindsey & Africa and Allegis, with a stained history and established blueprint of targeting strong and successful women who try to break free from the toxic, locker-room culture built by Bisciotti and fostered by Davis, have relentlessly and unlawfully attacked and defamed Ms. Mahn.

28.     Defendants use the legal system as lawfare, attempting to throw shade and dirt at Ms. Mahn in the hopes that no one will notice their abysmal unlawful conduct in their continued effort to silence her.

29.     Ms. Mahn could not have comprehended that these Forbes-listed billionaires and their companies (Defendants here, Allegis and Major, Lindsey & Africa) would use their endless wealth to tilt the scales of justice and instead exploit the legal system and abuse its processes for now over fifteen years, channeling millions of dollars into efforts to crush her, but they have.

30.     Whenever there is even a hint of news that might tarnish the false luster surrounding the Defendants, they exploit their market power to suppress the truth, wield their connections and influence to divert the narrative, and strategically employ philanthropic donations to obscure their

disgraceful and unlawful conduct.

31. Davis and Bisciotti, past and present rulers of Allegis, continue their parade of so-called generosity, diverting millions to their "non-profit" foundations. But while they position themselves as benevolent benefactors, the truth tells a different story – behind the feigned philanthropic veneer, their entities relentlessly continue their unjust and targeted pursuit of Ms. Mahn; as their lawyer said, they simply cannot "let this go."

32. While Davis and his Allegis Foundation are donating $10 million dollars to "fight for social justice" his entourage of lawyers are contemporaneously making sure that Ms. Mahn gets no justice.

33. It is too duplicitous, that the malevolent defamatory statements now spewed by Major, Lindsey & Africa, relate to a 2010 arbitration employment dispute where it claimed that Ms. Mahn disclosed its "confidential information and trade secrets" (described at the time as "confidential attorney candidate information").

34. Yet now when Major, Lindsey & Africa is sued by current female attorney candidates for racial discrimination in one suit, and for sex and age discrimination and fraud in another, it ironically now claims to have no contractual relationship with attorney candidates, labeling them now as lowly "job seekers," clamoring that it only has *contracts* with law firms and employers, the entities that pay it commissions. *See*, *Gita F. Sankano v. Major, Lindsey & Africa LLC, Andy Ufberg, Randi Lewis, and Eliza Stoker,* Docket No.: 24-cv-00951(TJS), *Saas v. Major, Lindsey & Africa, LLC and Allegis Group, Inc.,* Docket No.: 23-cv-02102(JRR)(the "*Saas* Action").

35. The hypocrisy is rich, Defendants' spewing their *per se* defamatory statements against Ms. Mahn's handling of candidate information was "criminal conduct" and the aerial

gymnastics pivoting, now admitting in 2024 Court filings that they owe those same "job seekers" nothing, no contractual duty, as they are not "beholden" or contractually bound in any way to such non-paying persons, rendering Defendants 15-year quest to destroy Ms. Mahn completely without legal basis.

36.    Ms. Mahn waited years before she was able to bring her claims for sexual assault and sexual battery claims against Mullman pursuant to the New York Adult Survivors Act and Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 ("End Forced Arbitration Act"), and related claims against Major, Lindsey & Africa, Lindsey, and Caplane, as filed in the New York Action in November 2023.

37.    Ms. Mahn filed the New York Action to ensure her voice would be heard and to hold Mullman, along with his cohorts – Lindsey, Caplane, and Major Lindsey & Africa – legally accountable for their respective unlawful conduct.

38.    Once the New York Action was filed, Defendants lashed out and retaliated with a barrage of false and defamatory statements detailed herein.

39.    The acts of sexual assault and battery committed by Mullman inflicted deep physical and emotional trauma on Ms. Mahn, leaving her with lasting psychological wounds, a loss of dignity, and a grave violation of her privacy.

40.    The defamatory statements made by Defendants have only intensified this suffering and their relentless abuse of process is unlawful.

41.    Ms. Mahn initiated this lawsuit to secure judicial redress for her injuries and to demonstrate that even billionaires like Davis and his vast kingdom of enterprises, Defendants, are not beyond the reach of the law and that they must be held accountable for their unlawful conduct.

**PARTIES**

42.     Ms. Mahn is a resident and domiciled in the State of New York.

43.     Allegis Group, Inc. is a privately held entity, incorporated in the State of Maryland on July 14, 1983, and has its principal place of business at 7301 Parkway Drive, Hanover, Maryland 21076.

44.     Allegis Group, Inc. is a wholly owned subsidiary of Allegis Group Holdings, Inc.

45.     Allegis Group Holdings, Inc. is a privately held entity and is incorporated in the State of Maryland, with its principal place of business at 7301 Parkway Drive, Hanover, Maryland 21076.

46.     For diversity purposes, Allegis takes the citizenship of each of its members.

47.     Allegis transacts business in New York when on its own initiative, projects itself into the State of New York to engage in a sustained and substantial transaction of business itself, and through its common enterprise, Major, Lindsey & Africa.

48.     Allegis transacts business in the State of New York, and sent its agents, Reichert and Maureen Dry-Wasson ("Wasson") into the State of New York to threaten and/or intimidate Ms. Mahn, and thus caused injury in the State of New York.

49.     Allegis' contacts with the State of New York establish that it purposefully availed itself of the privilege of conducting activities within the State of New York, thus invoking the benefits and protections of its laws.

50.     Allegis committed tortious acts, abuse of process, and defamation, that caused Ms. Mahn injury in the State of New York.

51.     Allegis specifically inserted itself and its authorized agent in-house lawyers into New York on multiple occasions, beginning in 2009 and as recently as 2024, for the purpose of

threatening and/or intimidating and defaming Ms. Mahn and abusing the civil process.

52.    Major, Lindsey & Africa was newly incorporated in the State of Maryland on January 9, 2009, and has its principal place of business at 7320 Parkway Drive, Hanover, Maryland 21076.

53.    Major, Lindsey & Africa LLC is a State of Maryland limited liability company.

54.    Major, Lindsey & Africa, LLC has one member, MLA Legal, LLC.[5]

55.    MLA Legal, LLC is a State of Delaware limited liability company.

56.    The sole member of MLA Legal LLC is defendant Allegis Group, Inc.

57.    As such, Major, Lindsey & Africa's citizenship for diversity purposes are the States of Maryland and Delaware.

58.    Major, Lindsey & Africa, upon information and belief, transacts business in the State of New York, and its legal agents, including non-parties, David Doyle ("Doyle") and Patrick Lyle Kenney ("Kenney"), and William E. Vita ("Vita"), each reached into the State of New York to threaten and/or intimidate Ms. Mahn, and Doyle and Daniel S. Goldstein ("Goldstein") acting *in tandem* on its behalf, defamed Ms. Mahn and engaged in the abusive process against her, and thus caused injury in the State of New York.

59.    Major, Lindsey & Africa's contacts with the State of New York establish that it purposefully availed itself of the privilege of conducting activities within the State of New York, thus invoking the benefits and protections of its laws.

60.    Major, Lindsey & Africa committed tortious acts, abuse of process, and defamation, that caused Ms. Mahn injury in the State of New York.

---

[5] Allegis acquired the Delaware entity of Major, Lindsey & Africa, LLC in 2008, and Allegis' then general counsel, Ronald Sones, signed the State of Delaware Certificate of Amendment on September 5, 2008, changing the entity's name to MLA Legal, LLC.

61.     Major, Lindsey & Africa literally lied in its submission to the New York State Supreme Court, the New York Action, defaming Ms. Mahn.

62.     Major, Lindsey & Africa specifically inserted itself and its posse of lawyers into New York on multiple occasions, beginning in 2009 and as recently as 2024, for the purpose of threatening and/or intimidating and defaming Ms. Mahn and abusing the civil process.

63.     Major, Lindsey & Africa transacts business on a regular and continual basis in the State of New York, maintaining an office in New York County at 530 Fifth Avenue, New York, New York 10036.

64.     Ms. Mahn is a citizen of the State of New York.

65.     Defendants are citizens of the State of Maryland and the State of Delaware.

66.     As such, no plaintiff is a citizen of the same state as any defendant, and the complete diversity requirement is met.

**DEFENDANTS COMMON ENTERPRISE**

67.     Defendants are data brokers that sell data about attorneys (the "*job seekers*") to law firms and businesses, essentially monetizing non-client attorney data (with whom they have no contractual relationship and to whom they are not "beholden,") and using that information in presenting them as potential candidates to Defendants' law firm and business entity clients.

68.     Defendants hold themselves out to the public as a common enterprise and are, upon information and belief, engaged in a data monetization stratagem as one entity.

69.     Defendants co-brand themselves in their correspondence and share legal teams in their collective effort to fend off allegations of discrimination and fraud.

70.     Defendants hold Wasson out to the federal government as "VP-Group General Counsel and Global Privacy Officer at Allegis Group, Inc."

71.     Upon information and belief, Wasson, is an employee of Allegis, as reflected on her LinkedIn profile.

72.     Defendants are algorithmically indistinguishable; one cannot operate without the flow of data to and from the other.

73.     The clandestine workings of Defendants' websites, www.mlaglobal.com and www.allegisgroup.com, elucidate the intricate web of interactions and algorithms that bind their foundational framework in a common enterprise.

74.     Since the initiation of the *Saas* Action on August 4, 2023 (its dismissal and her appeal to the United States Court of Appeals, Fourth Circuit), which revealed Defendants' interdependency, Defendants have since successfully purged the internet of the content that exposed and illuminated their interdependent common enterprise infrastructure.

75.     Defendants are algorithmically interdependent.

76.     Defendants traffic in third-party data.

77.     After the *Saas* Action publicized Defendants' joint and communal algorithmic interdependency in data sharing infrastructure, Defendants, upon information and belief, promptly altered the binary coding on their websites to eradicate the interdependence from public visibility.

78.     Defendants and/or their agents, upon information and belief, purposefully modified both websites' code or configuration www.mlaglobal.com and www.allegisgroup.com to now conceal their common enterprise from the prying eyes of justice.

79.     Since its acquisition of Major, Lindsey & Africa in 2019, Allegis has, upon information and belief, and diligent inquiry, exerted complete and utter control and domination over Major, Lindsey & Africa, including, sharing employees, sharing legal teams and resources, financial and data sharing, algorithmic dependency of Major, Lindsey & Africa on Allegis' global

data tracking monetization, and Allegis likewise dominates and controls Major, Lindsey & Africa's executive personnel.

80.    It is alleged that as a result of such interdependency, upon information and belief, the Defendants file one consolidated tax return.

**NON-PARTIES, BISCIOTTI, DAVIS, DOYLE, GOLDSTEIN, KENNEY, WASSON, MULLMAN, CAPLANE, AND LINDSEY**

81.    Stephen Joseph Bisciotti is, upon information and belief, a resident and domicile of the State of Florida.

82.    Bisciotti, upon information and belief:

a.    Apparently began his career working, ironically, as a recruiter for Kelly Services Inc. *See*, https://www.washingtonpost.com/archive/business/2003/11/17/quietly-preparing-to-call-the-plays/5a39b1e4-660b-4158-9735-3428e8dd91b6/ (Last visited Oct. 26, 2024);

b.    According to former Maryland State House Speaker, Michael E. Busch, Bisciotti was laid off from that role during the Christmas season at the age of 23, and Bisciotti purportedly said, "he was determined to go out and establish his own business and compete against them."  *Id.* (Literally injudicious considering the premise of Defendants' endless pursuit of Ms. Mahn).

c.    On July 14, 1983, Bisciotti, joined by his cousin Davis, cofounded Aero-Tek, Inc. (now known as defendant Allegis).

d.    On September 2, 1988, Bisciotti, again joined by Davis cofounded Maxim Healthcare, Inc. ("Maxim"), each owning 46% of the company.

e.    During his reign as an owner of Allegis, Allegis purchased defendant Major, Lindsey & Africa in 2008, while Ms. Mahn was employed.

    f.   Defendants began their malevolent efforts to destroy and bankrupt Ms. Mahn (2009), Bisciotti was, upon information and belief, an owner of each of the Defendants.

    g.   While Bisciotti's troll entities aimed to drive Ms. Mahn into financial ruin, he simultaneously directed hundreds of thousands (if not millions) through The Stephen and Renee Bisciotti Foundation, Inc. to associated Catholic charities, including organizations dedicated to providing emergency, temporary, and long-term housing, as if philanthropy could obscure his entities aggressive tactics against Ms. Mahn.

    h.   It is unknown when (or if) Bisciotti formally divested his ownership interests in the Defendants, but he remained associated with Allegis, serving as a Director to its foundation, Allegis Foundation Group, Inc., from its inception through at least the end of 2014.

    i.   Defendants, their agents, all with Bisciotti's blessing and authority from 2009-2014, have pursued Ms. Mahn, a solitary former top-performing legal recruiter, in a vicious effort to "destroy," and "bankrupt" Ms. Mahn.

83.    Although it is unknown if Bisciotti retains lingering or current ownership in either of the Defendant entities, as he is reportedly now the sole owner of the National Football League's Baltimore Ravens, his conduct during his ownership of Defendants left an indelible mark in their locker room leadership style that lacks integrity and disregards abusive conduct toward women in their ranks, including Ms. Mahn.

84.    Upon information and belief, Bisciotti was aware and actively directed his agents to torment Ms. Mahn, who had the audacity of wanting to leave the toxicity at Major, Lindsey &

Africa in 2009, during his reign.

85.     Ms. Mahn has always been apprehensive in bringing the abuse of process claim that she alleges here because of the retribution Bisciotti is known for, and that of his cronies that insulate him from anything that would tarnish his underserved shiny reputation, and protect his carefully cultivated image.  However, Bisciotti set in motion a savage hunt for Ms. Mahn and he can own his participation.

86.     James Charles Davis, upon information and belief, is:

a.   The ultimate owner of Defendants and operates from behind a labyrinth of tangled corporate layers, intentionally crafted to shield and disguise his ownership and shield him from any liability.

b.   The sole owner of Allegis, a private entity worth more than $15 billion in 2024, is ultimately owned and run by Davis.

c.   The sole owner of Defendant Major, Lindsey & Africa, which has an estimated annual income of $73.5 million, is ultimately owned and run by Davis.

d.   Davis's estimated net worth is in excess of $4.1 billion in 2024.

e.   Defendants, their agents, all with Davis's blessing and authority, have pursued Ms. Mahn, a solitary top-performing legal recruiter, for more than 15 years, in a vicious effort to "destroy," "bankrupt," and now defame Ms. Mahn.

f.   Davis uses the entity Allegis, Redwood, Maxim Public Affairs LLC in his state and federal lobbying efforts for his interrelated common enterprise, including Defendants.

g.   During the period that Davis's entities hunted Ms. Mahn (2009-2024), he sprinkles his millions in charitable donations, through defendant Allegis, or The Davis

Family Foundation, Inc.  But like Bisciotti, Davis's philanthropy does not erase the devastation his entities have pounced upon Ms. Mahn, and he too should own his active participation in the shameful abuse of process and defamation attributed to the entities he owns.

87.    Ms. Mahn has hesitated to bring forth this abuse of process claim, and the defamation claims, anticipating Davis's maniacal response and the network of allies that fiercely protect his unearned polished reputation but he now must own the credit for their despicable and unlawful conduct.

88.    David Doyle is, upon information and belief, an attorney at the law firm of Smith, Gambrell & Russell International, LLP located in Chicago, Illinois.

89.    Upon information and belief, Doyle is licensed to practice law in Illinois.

90.    Doyle filed and was granted admission to the New York State Supreme Court, as *pro hac vice* counsel to Major, Lindsey & Africa in the New York Action.

91.    Doyle, an attorney admitted *pro hac vice* was required and had a duty to be familiar with and was required to comply with the standards of professional conduct imposed upon members of the New York bar, including the rules of Court governing the conduct of attorneys and the Rules of Professional Conduct.

92.    Doyle is an authorized agent of Defendants and committed a tortious act, abuse of process, and defamation, that caused Ms. Mahn injury in the State of New York.

93.    Doyle, at all relevant times, was acting as an agent with the authority of Defendants.

94.    Daniel S. Goldstein is upon information and belief, an attorney at the law firm of Smith, Gambrell & Russell International, LLP.

95.    Upon information and belief, Goldstein is licensed to practice law in New York.

96.     Goldstein, an attorney admitted to practice law in New York, has a duty and is required to be familiar with and was required to comply with the standards of professional conduct imposed upon members of the New York Bar, including the rules of Court governing the conduct of attorneys and the Rules of Professional Conduct.

97.     Goldstein is an authorized agent of Defendants and committed a tortious act, abuse of process, and defamation, that caused Ms. Mahn injury in the State of New York.

98.     Goldstein, at all relevant times, was acting as an agent with the authority of Defendants.

99.     Patrick Lyle Kenney is, upon information and belief, an attorney at the law firm of Shook, Hardy & Bacon L.L.P.

100.    Upon information and belief, Kenney is licensed to practice law in Kanas and Missouri.

101.    Kenney filed and was granted admission to the New York State Supreme Court, as *pro hac vice* counsel to Major, Lindsey & Africa in the matter captioned, *Sharon Mahn v. Major, Lindsey & Africa, LLC,* 653048/2014.

102.    Kenney, an attorney admitted *pro hac vice,* had a duty and was required to be familiar with and was required to comply with the standards of professional conduct imposed upon members of the New York bar, including the rules of Court governing the conduct of attorneys and the Rules of Professional Conduct.

103.    Kenney conducted a virtual deposition of Ms. Mahn on February 22, 2021, as *pro hac vice* counsel, knowing that Ms. Mahn was physically in New York, and purposely used the deposition for an improper purpose, and well beyond the scope of a "debtor" deposition in threatening her with multiple sanctions, stalked her social media and then used it at the deposition

to threaten and intimidate her that she should keep her mouth shut concerning Bisciotti and Major, Lindsey & Africa, and continuously threatened to have her sanctioned, and with knowledge that Ms. Mahn was in New York and would likewise be harmed in the State of New York.

104.    Kenney was the authorized agent of Defendants when he threatened Ms. Mahn, through counsel, that she needed to get a "loan and make a lump sum offer that will make MLA decide that it can let this go.  Otherwise, it is likely that every dollar of profit Mahn earns for the rest of her working life will be going to MLA to satisfy the $4 million judgment against her."

105.    Kenney, as an authorized agent of Defendants, advises Ms. Mahn to get a loan and make an offer because his client cannot "get over it" and states the consequence that his clients want, that Ms. Mahn will work the rest of her life to pay Major, Lindsey & Africa for a judgment obtained through lawless arbitration; the arrogance and improper purpose is staggering.

106.    Kenney committed a tortious act, abuse of process, that caused Ms. Mahn injury in the State of New York.

107.    Kenney, at all relevant times, was acting as an agent with the authority of Major, Lindsey & Africa.

108.    Upon information and belief, Vita is an attorney at the law firm of Shook, Hardy & Bacon L.L.P.

109.    Upon information and belief, Vita is licensed to practice law in New York.

110.    Vita appeared as counsel of record in the New York State Supreme Court, as counsel to Major, Lindsey & Africa in the matter captioned, *Mahn, Sharon v. Major, Lindsey & Africa, LLC,* 653048/2014.

111.    Vita, an attorney admitted to practice law in New York, has a duty and is required to be familiar with and is required to comply with the standards of professional conduct imposed

upon members of the New York Bar, including the rules of Court governing the conduct of attorneys and the Rules of Professional Conduct.

112.    Vita committed a tortious act, abuse of process, that caused Ms. Mahn injury in the State of New York.

113.    Vita, at all relevant times, was acting as an agent with the authority of Major, Lindsey & Africa.

114.    Vita, as counsel to Major, Lindsey & Africa, filed a baseless motion seeking to punish Ms. Mahn for allegedly violating a Court order (that was denied), issued overbroad *subpoenas* to Ms. Mahn's financial institution and employer, had Ms. Mahn's business operating account improperly frozen, sought the help from a New York Sheriff to execute on and wipe out Ms. Mahn simple employee pension account and orchestrated the issuance of two *subpoenas* to Ms. Mahn's elderly father, all with improper purpose, to "destroy" Ms. Mahn, and harass her family.

115.    Wasson, upon information and belief, is an employee of Allegis and is paid compensation by Allegis.

116.    Wasson holds herself out to the public as the Vice President - Group General Counsel and Global Privacy Officer to defendant Allegis.

117.    Wasson likewise holds herself out to the public, at convenient times, as a General Counsel and Corporate Secretary for Major, Lindsey & Africa, and Allegis Partners, each part of the Allegis common enterprises.

118.    In November 2009, upon information and belief, in her capacity as Vice President of Allegis, Wasson instructed her direct report, then Allegis lawyer Reichert, to threaten Ms. Mahn, that Defendants would "destroy her" and "bankrupt" her.

119.    Since 2009, Wasson, who is a Vice President of Allegis (the entity was then owned by Bisciotti as fifty percent owner of Allegis, and Davis owning the other fifty percent (50%)) has attended every appearance with the troupe of other lawyers hired by, and ultimately paid for by Allegis, as the ultimate corporate owner of Major, Lindsey & Africa.

120.    Wasson weaponized her position as an officer of Allegis to be sure that Ms. Mahn knew that a privately held company, with its billions of dollars, was laser-focused on destroying Ms. Mahn.

121.    Wasson seems delighted in her mission to have accomplished the original threat conveyed by her underling, in forcing Ms. Mahn into bankruptcy.

122.    Upon information and belief, Bisciotti and Davis sent Allegis' then Vice President – Group General Counsel, Wasson, an Allegis employee, to the secret arbitration for the sole purpose of intimidating Ms. Mahn, as there were already a kaleidoscope of law firm lawyers running the clock on attorney's fees.

123.    Upon information and belief, Wasson was not representing a "party" to the arbitration, she was employed by Allegis at the time, as its "assistant general counsel for Allegis Group in Hanover" Maryland.

*See*,   https://law.ubalt.edu/downloads/law_downloads/weekly%208-9.pdf (October 2011) (Last visited Oct. 26, 2024); https://thedailyrecord.com/2011/10/02/e-billing-helps-corporate-counsel-track-spending-on-outside-law-firms/ (October 2012) (Last visited Oct. 26, 2024).

124.    Upon information and belief, Wasson was paid by Allegis in 2012, and she continues to hold herself out to the public as Allegis' Global General Counsel to this day.  *See*, https://www.linkedin.com/in/maureen-dry-wasson-60894ba/.

125.    Wasson, as an authorized agent of Allegis, was intentionally dispatched from

Allegis' Maryland empire to New York expressly for the improper abusive purpose of harassing and intimidating Ms. Mahn.

126.    Lawrence N. Mullman is, upon information and belief, a former principal at defendant Major, Lindsey & Africa.

127.    Mullman is an attorney by training but was suspended from the practice of law in New York on October 21, 2010.[6]

128.    The New York Action included claims against Mullman for sexual assault and sexual battery.

129.    In response to Ms. Mahn's New York Action, Mullman seized the same platform where Major, Lindsey & Africa defamed Ms. Mahn to offer for publication in The American Lawyer article his vile remark in response to the verified allegations against him for sexual assault and sexual battery that: he "wasn't even attracted to Sharon Mahn."

130.    Laurie Ann Caplane (a/k/a Laurie A. Aronoff) is, upon information and belief, a former principal of defendant Major, Lindsey & Africa.

131.    In response to the New York Action, Caplane feigned ignorance offering that she would not have "worked for any length of time in an environment like the one [Ms. Mahn's] lawsuit depicts."

132.    Yet, Caplane currently works with yet another former top female recruiter who escaped Major, Lindsey & Africa, Lauren Drake.  In response to a lawsuit filed by Major, Lindsey & Africa against Ms. Drake, her counsel confirmed, "citing a toxic, misogynistic work environment perpetuated by high-ranking MLA executives as Drake's reason for leaving" and that "Ms. Drake…has the utmost confidence that her representations regarding the MLA work

---

[6] *Matter of Attorneys Who Are in Violation of Judiciary Law Section 468-a*, 2010 NY Slip Op. 07468 (1st Dept. 2010).

environment are not only accurate, but would be supported by numerous current and former employees of MLA," and that it "continues to host an unprofessional and male-dominated workplace atmosphere in which senior male executives engage in highly inappropriate conduct with subordinate female employees." *See*, Mike Scarcella, *Major Lindsey, Suing Ex-Partner Over Noncompete, Faces Her Claims of Misconduct,* Law.com (November 1, 2019). On November 22, 2019, Major, Lindsey & Africa retreated, dismissing its own lawsuit with prejudice.

133.    Jonathan Austin Lindsey is, upon information and belief, a principal at defendant Major, Lindsey & Africa.

134.    Lindsey was admitted to the New York bar in 1976.

135.    Lindsey was named personally in the New York Action.

136.    Lindsey was previously an Assistant U.S. Attorney in the Southern District of New York.

137.    Lindsey thus has at least some long past experience in criminal law and prosecution.

138.    It was not until Ms. Mahn sued under the Adult Survivor Act and the End Forced Arbitration Act, that Lindsey and his agents chose to inject false and defamatory *per se* statements of criminal conduct and lying about the "stolen" "millions of dollars."

139.    Indeed, Lindsey never asserted that Ms. Mahn had engaged in any conduct that would constitute criminal conduct until he was sued in the New York Action.

JURISDICTION AND VENUE

140.    This Court has original subject-matter jurisdiction over these actions between citizens of the State of New York and the States of Maryland and Delaware, and the amount in controversy far exceeds $75,000.00, excluding interest and costs pursuant to 28 U.S.C. § 1332(a)(1).

141.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of

the events giving rise to this action, defamation, and abuse of process, occurred in this judicial district.

## THE ABUSE OF PROCESS 15 YEAR TIMELINE

142.    All of the verified facts alleged here are relevant, pertinent, or material to Ms. Mahn's claims for defamation *per se* and abuse of process that span from 2009 to 2024.

143.    Before Defendants targeted Ms. Mahn for destruction, Ms. Mahn, already a top legal recruiter, was actively engaged in tandem with other pursuits, purposely channeling her time and talent into serving and assisting corporate and philanthropic boards in the New York City area supporting United States Veterans, children and the Leukemia & Lymphoma Society, while also advising startup ventures in the media and entertainment arenas.

144.    Ms. Mahn was exceptional by every standard – as an entrepreneur, philanthropist, and phenomenally successful recruiter.  Then she joined Major, Lindsey & Africa.

145.    In 2008, Allegis, then owned by Bisciotti and Davis, infused not only tens of millions of cash into Major, Lindsey & Africa when they bought it, but they also brought with them the locker room mentality that only further emboldened the toxic boys club that saturated Major, Lindsey & Africa, as perpetuated by Lindsey and Mullman.

146.    Allegis infused its vulgar and fraternity-styled management, apparently minted by Bisciotti and Davis, into and upon Major, Lindsey & Africa, and by default upon Ms. Mahn.

147.    Major, Lindsey & Africa, under the Allegis umbrella, offer the meaningless overture that they are supportive of women is utter garbage, in truth the work environment, endorsed and promoted by Allegis, as endured by Ms. Mahn, and others, was steeped in contempt, disrespect, and outright hostility and complete disregard of the law.

148.    Defendants are extremely hostile and use threats, intimidation, bullying,

defamation, and abuse of process in weaponizing their wealth to harass, humiliate, and badger former employees and recruiters who have the temerity to leave, like Ms. Mahn.

149.    Under the flagship of the common enterprise of being an Allegis entity, Major, Lindsey & Africa's unethical conduct and misogynist culture flourished.

150.    Ms. Mahn was always cautious in her comments about Allegis, and in particular, Bisciotti and Davis, as anyone who questioned its directives from their perch in Maryland was eviscerated, threatened or fired and escorted out by security and Major, Lindsey & Africa echoed these scare tactics and abuse of authority on a daily basis.

151.    Allegis, Bisciotti, and Davis, all driven by an unwavering determination to reshape their newly acquired New York outpost of Major, Lindsey & Africa in alignment with their exclusive boys' club agenda, dispatched a "Coach" as a strategic enforcer, intensifying the imposition of their deeply ingrained misogynistic ideologies.

152.    Ms. Mahn's instincts about being leery of Bisciotti and Davis, and that she had to remain silent concerning Mullman's sexual assault and sexual battery she suffered in 2006, were later confirmed as stories started to emerge about Bisciotti and his vindictive tendencies and how he built his financial empire in part through his cofounding of, with Davis, Maxim.

153.    Ms. Mahn was deeply disturbed that during her protracted arbitration, during 2011, Bisciotti and Davis owned Maxim "was charged…in a criminal complaint with conspiracy to commit health care fraud, and ha[d] entered into a deferred prosecution agreement (DPA) with the Department of Justice." *See, https://www.justice.gov/opa/pr/maxim-healthcare-services-charged-fraud-agrees-pay-approximately-150-million-enact-reforms* (Last visited Oct. 24, 2024).

154.    Essentially, and according to the Department of Justice, Maxim fleeced the Veterans Affairs and Medicaid programs and to avoid prosecution "agreed to pay a criminal penalty of $20

million and to pay approximately $130 million in civil settlements in the matter…." *Id.*

155.    True, neither Bisciotti nor Davis were ever charged[7] (but at 46% percent ownership, each certainly, upon information and belief, profited wildly from Maxim's alleged unlawful conduct), and "avoided the penalty that would have the biggest impact on its bottom line: disbarment from federal health care programs."[8]

156.    Ms. Mahn found their ability to stroke a check for $20 million in criminal penalties, and another settlement payment for $130 million in fines, while simultaneously and relentlessly pursuing Ms. Mahn in arbitration, astonishing.

157.    While Defendants were abusing Ms. Mahn in their pursuits against her 2009-2014, Allegis (using Major, Lindsey & Africa as its complicit surrogate), Bisciotti exhibited no inclination to extend the *redemption* made available to his Baltimore Ravens football player, to Ms. Mahn; rather Major, Lindsey & Africa and Allegis pursued her with predatory intensity as if they were stalking prey.

**THE DEFENDANTS'** *IN TERROREM* **ABUSE OF PROCESS**

158.    Following Ms. Mahn's disclosure that she was leaving Major, Lindsey & Africa to join a small recruiting firm, Major, Lindsey & Africa terminated her and offered that it had been "irreparably harmed," threatened to seek an injunction and prevent Ms. Mahn from earning a living, and then ultimately failed to file any injunction that would have been subject to judicial scrutiny.

---

[7] Bisciotti and David built their empires, starting in 1988 with Maxim Healthcare, Inc. on the backs of taxpayers and veterans: https://www.justice.gov/sites/default/files/usao-nj/legacy/2014/09/02/Maxim%20Complaint.pdf (Last visited Oct. 31, 2024) (*United States of America v. Maxim Healthcare, Inc.* criminal complaint for fraud, and then getting a pass by way of a deferred prosecution agreement (*see,* https://www.justice.gov/sites/default/files/usao-nj/legacy/2014/09/02/Maxim%20DPA.pdf (Last visited Oct. 28, 2024).

[8] *See,* Cohn, Meridith. "*Companies That Cheat Are Rarely Disbarred.*" Baltimore Sun, Sept. 11, 2011, pp. C1-4, https://www.baltimoresun.com/2011/09/17/companies-that-cheat-government-are-rarely-disbarred/ (Last visited Oct. 28, 2024).

159.    Major, Lindsey & Africa then refused to pay Ms. Mahn approximately $120,000 in commissions for certain placements she made in 2008 and 2009 on which Major, Lindsey & Africa made more than $300,000 in placement fees, which Lindsey later confirmed and acknowledged that Ms. Mahn had lawfully earned.

160.    Indeed, in late October 2009, Caplane, stealthily continuing her practice of reading Ms. Mahn's firm email account, learning that Ms. Mahn was contemplating leaving Major, Lindsey & Africa, to join a four-person recruiting firm in New York.

161.    As is its *modus operandi*, Major, Lindsey & Africa would not let Ms. Mahn escape on her own terms.

162.    Instead, less than one month later and while Ms. Mahn was still reeling from her mother's long-term illness and death, she and another Major, Lindsey & Africa colleague were about to depart on a trip to meet with a *competitor legal recruiter* in London, with its blessing, began the quest to destroy her, starting with her firing in November 2009.

163.    Major, Lindsey & Africa, not wanting Ms. Mahn to leave on her own terms, instead rushed in to fire her, claiming, for the first time, that it was terminating Ms. Mahn because it had just "discovered" that she had cross-referenced, collaborated and shared information with and profited off of recruiters outside of Major, Lindsey & Africa, a fact that they already knew and had happily and generously profited from.

164.    Ms. Mahn alleges that this was merely a pretext to unlawfully withhold Ms. Mahn's final six-figure paycheck.

165.    Major, Lindsey & Africa was fully informed, knew, and had literally no issue with Ms. Mahn's collaboration, cross-referencing, and sharing information with other recruiters concerning attorney candidates because Major, Lindsey & Africa was making money off those

relationships that Ms. Mahn had developed over her decades of legal recruiting experience.

166.    And, since Major, Lindsey & Africa, at Caplane's instruction, had been surreptitiously monitoring not only Ms. Mahn's Major, Lindsey & Africa email account, it was also, upon information and belief, accessing and monitoring part of her personal @hotmail.com account, its later feigned surprise was specious.

167.    This covert access gave Major, Lindsey & Africa a complete and thorough and contemporaneous snapshot of all of Ms. Mahn's communications throughout her employment at Major, Lindsey & Africa, and its analysis of these accounts confirmed that Ms. Mahn was not communicating anything improperly.

168.    Caplane had Ms. Mahn's entire firm email account reviewed in 2008 (including many of the exhibits that were later offered in the secret arbitration proceeding as ostensibly improper) and the firm concluded that Ms. Mahn had not shared anything improperly.

169.    During that review, Major, Lindsey & Africa's Global Support Manager, Larry Wolfson, was instructed by Caplane to pull all of Ms. Mahn's firm emails, and he confirmed that he had "found nothing inappropriate yet," despite having used specific search terms looking for impropriety and then made a "perfect copy" of Ms. Mahn's entire firm email so that Caplane could troll through everything without Ms. Mahn's contemporaneous knowledge.

170.    Wolfson was also, upon information and belief, the person who transferred control of all of Major, Lindsey & Africa's IT services to Allegis after the purchase in 2008, confirming their common enterprise.

171.    Wolfson's confirmation that Ms. Mahn had not shared anything improper evidences its full and contemporaneous knowledge of Ms. Mahn's collaborative efforts without complaint or concern.

172.    Major, Lindsey & Africa knew that Ms. Mahn collaborated and shared information with her recruiting colleagues both inside and outside the firm (as did the other recruiters in Major, Lindsey & Africa's New York office) and had no issue with it because Ms. Mahn was always among its top revenue generators worldwide every year she was there, and Major, Lindsey & Africa was making millions off Ms. Mahn's placements.

173.    Likewise, since Caplane had Ms. Mahn's work email account specifically culled and analyzed in 2008, and never formally (or even informally) reprimanded Ms. Mahn for a single communication, its later claim after her announcement that she was leaving of some illicit wrongdoing was only an attempt to impede her successful transition away from the firm and make sure she kept her mouth shut about all of the unlawful and improper behavior she witnessed and was subjected to.

174.    Major, Lindsey & Africa's excuse that Ms. Mahn was being terminated for something that it *fully supported and encouraged* prior to Ms. Mahn's termination confirms that its action in terminating her was intentionally pretextual and was done to humiliate and further its intention to silence her from revealing the abhorrent treatment she suffered under its employ.

175.    After terminating (so she couldn't quit) Ms. Mahn, Major, Lindsey & Africa did nothing for 189 days.

176.    It is seemingly textbook legal practice when an employee potentially has possession of corporate or organizational confidential information, most dash to Court seeking emergent judicial restraint and an injunction.

177.    Major, Lindsey & Africa's delay in pursuing Ms. Mahn was due, in part, to its knowledge that Ms. Mahn knew of all of the unlawful and ethically vacant conduct that saturates the firm.

178.    Although the legal recruiting industry is extremely lucrative, it is surprisingly unregulated, a furtive industry where Defendants' unlawful conduct goes unnoticed in the shadows.

179.    As there are no consequences if legal recruiters and data brokers like Major, Lindsey & Africa violate the ethics guidelines, its duplicitous behavior and unscrupulous legal recruiting practices go unchecked.

180.    Ms. Mahn exposed internal corruption, including the real-time complicit theft of data from a competitor, data that Major, Lindsey & Africa readily used and profited from, and then promoted the employee who brought the third-party data to it.

181.    Because Ms. Mahn chose to be a whistleblower, Defendants have sought to humiliate and punish her and shut her up for 15 long years, its messaging to other recruiters was clear that they too would suffer if they followed in Ms. Mahn's path.

182.    During the years Ms. Mahn was at Major, Lindsey & Africa, she made it millions of dollars, including millions of dollars from referrals she received from other competitor recruiters with whom she collaborated.

183.    Most notably Major, Lindsey & Africa's then largest placement fee came from a competitor recruiter based upon Ms. Mahn's ongoing relationship with that entity.

184.    Major, Lindsey & Africa actively lured "job seekers" with false and fictitious job opportunities to obtain their resumes and information about their employer law firms and other data points.

185.    Major, Lindsey & Africa also sought to train Ms. Mahn and other legal recruiters in how to approach and poach lawyer candidates from its law firm clients, despite contractual timing and geographical restrictions to the contrary, and despite hands-off list requirements, and

would use the information it gathered against its own clients.

186.    By way of example only, when a Philadelphia colleague wrote that it was meeting with the Managing Partners of a BigLaw firm in Philadelphia, Ms. Mahn wrote to Caplane:

> Not sure why Janet [Markoff] would say all of this…why are we even MEETING with [BigLaw] when I am clearly WIPING OUT their NY office, including the Managing Partner?  We should have some integrity…  This is very sneaky… we are clearly taking out teams of people, and close to hurting them financially in New York, yet we still put up the pretense at this juncture that we want to recruit for the firm? I don't understand…perhaps we can address ethics at our next partner meeting.

187.    Caplane ignored Ms. Mahn's complaint concerning this conflicting behavior.

188.    Ms. Mahn herself never engaged in any of this unethical conduct.

189.    Ms. Mahn finally had enough of the toxicity and confirmed she was leaving, Major, Lindsey & Africa went ballistic in its effort to destroy her.

190.    Six months later Major, Lindsey & Africa sauntered into the United States District Court, Southern District of New York, with its freshly minted complaint against Ms. Mahn, captioned: *Major, Lindsey & Africa, LLC v. Mahn*, Docket No.: 10-CV-4239 (CM). This was an abuse of process.

191.    Defendants' collaborative May 2010 filing was made with the intent and purpose of intimidating Ms. Mahn, falsely branding her as a racketeer, smear her reputation, and as promised, to "destroy" and eventually "bankrupt" her.

192.    Yet Major, Lindsey & Africa has now admitted in federal judicial filings that it has absolutely no contractual relationship with any attorney "job seeker" and is not "beholden" to any such attorney candidate, and thus admittedly has no confidential relationship or information either.

193.    This admission exposes its feigned complaints about Ms. Mahn's handling of attorney candidate information for fifteen years as entirely fabricated and legally meritless.

194.    The filing of these "bogus" claims at Defendants' direction was an abuse of process,

implemented and inked by their lawyers and authorized agents, Littler Mendelson, P.C.

195.    Upon information and belief, the purpose of Major, Lindsey & Africa, driven and funded with Allegis' money, sealing the 2010 federal court filing was a proverbial hat trick in purpose and intended effect: i) Major, Lindsey & Africa commenced the bogus federal RICO action, as Judge McMahon coined the phrase, *in terrorem* – which literally means to produce terror – to terrorize and intimidate Ms. Mahn; 2) to force Ms. Mahn to incur enormous legal fees (more than one million dollars) in her efforts to defend her reputation from its salacious federal filing; and iii) make Ms. Mahn defend the wave of media coverage plastered all over print and social media to defend herself against its made up and meritless claims.

196.    Major, Lindsey & Africa has a deserving reputation for clandestine legal filings to conceal its false and illicit submissions, and/or filing in open Court and getting the media splash, and then quietly withdrawing the claims under secret settlements.

197.    Under the cloak of corporate-friendly confidentiality arbitration, Major, Lindsey & Africa, and Allegis, under the directive of Bisciotti and Davis, all cynically abused and manipulated the justice system, bullying Ms. Mahn by obstructing any illumination of the truth in response to their flawed allegations.

198.    Major, Lindsey & Africa's 2010 filing was met with United States District Court Judge Colleen McMahon's bench slap, in ruling that:

- Major, Lindsey & Africa's only "hook for federal jurisdiction [was] Mahn's alleged violation of the Computer Fraud and Abuse Act," a claim that the Court promptly dismissed; *See*, *Major, Lindsey & Africa, LLC v. Mahn*, 2010 US Dist. LEXIS 94033,*2 (S.D.N.Y. Sep. 7, 2010, 10-CV-4239 (CM)).

- Denied Major, Lindsey & Africa's effort to obtain expedited discovery under its "RICO" claim, ruling that "This Court has ample experience with the assertion of bogus RICO claims for the purpose of (1) obtaining federal jurisdiction over an action that belongs in the state courts, and/or (2) extracting a coercive settlement due to the *in terrorem* nature of labeling someone as a racketeer" and that this

31

> "Court believes that until the 'thermonuclear' allegations of racketeering are addressed as a pleading matter…no other claims should proceed. Therefore, not only will there not be any expedited discovery, there will be no discovery whatsoever, until Major, Lindsey & Africa's racketeering allegations…are preliminarily addressed." *Id. *18.*

199.    An exhaustive search of the expansive LEXIS legal database lays bare a conspicuous absence: there exists no citation, be it in state or federal legal realms, that has ever endorsed the notion that Major, Lindsey & Africa's information on practicing attorneys "job seekers", to whom they are not "beholden," merits the safeguarding reserved for authentic trade secrets.

200.    Major, Lindsey & Africa is estopped from now claiming that "job seekers" are its secret sauce or that information for which it does not pay anything for (*e.g.*, the "job seekers" personal information) will ever rise to the level of a trade secret.

201.    Major, Lindsey & Africa's unwavering reliance on this chant is not rooted in legal precedent but rather in a self-aggrandizing and unsubstantiated view of the sanctity of content that it readily rejects when convenient.

202.    Saying something over and over again simply does not make it true.

203.    Judge McMahon confirmed that "of course not a dime in damages can be or will be awarded by this Court against Mahn in connection with any claim." *Major, Lindsey & Africa, LLC v. Mahn*, 2010 US Dist. LEXIS 94033,*12.

204.    Major, Lindsey & Africa's "bogus" federal filing was an abuse of process.

205.    Once on notice that it would be required to actually and preliminarily substantiate its "RICO" claims, Major, Lindsey & Africa ran for the hills and withdrew its complaint against Ms. Mahn just three days later, on September 10, 2010.

206.    Jeremy Botwinick, then of Littler Mendelson, P.C., later retrieved the sealed

complaint it had filed against Ms. Mahn so that it would never see the light of day.

207.    Shortly thereafter, Major, Lindsey & Africa's lawyers demanded that Ms. Mahn pay Major, Lindsey & Africa seven figures or they would file a claim in arbitration against her.

208.    Ms. Mahn believed that the demand was baseless and declined to pay.

209.    Ms. Mahn also believed at that moment, and until this day, that she had not done anything wrong, and was not going to pay an extortive sum.

210.    It is the way Defendants roll with regard to its high-profile legal recruiters like Ms. Mahn that is so disturbing, delighted to profit from her talents, but when she opted to escape the ever-present wretched boys clubs' menacing environment, Major, Lindsey & Africa went after her with particularly acute vengeance above and beyond any reasonable effort to prosecute any legitimate claim.

**Major, Lindsey & Africa Goes Forum Shopping**

211.    Having been crushed and eviscerated by Judge McMahon's published decision of September 7, 2010, Major, Lindsey & Africa then went forum shopping, with the first stop being its own client, the American Arbitration Association ("AAA").  AAA is a for-profit arbitration money-making machine.

212.    Indeed, who better for Major, Lindsey & Africa to use in its secret arbitration to run point against Ms. Mahn, than one of its own paying clients?

213.    The paid and contractual relationship between Major, Lindsey & Africa, and AAA was a clear conflict of interest that was never disclosed.

214.    When Ms. Mahn later learned of the conflict and complained, Major, Lindsey & Africa altered its website to remove its public listing of AAA as its client.

215.    This failure to disclose by Major, Lindsey & Africa was an abuse of process.

216.    Defendants' lawyer, David Warner, Esq., Littler Mendelson, P.C., conducted depositions during the protracted arbitration proceedings, asking a third party witnesses if they "ever had a romantic relationship with Ms. Mahn?" Such inquiries were not pertinent or relevant or material to any claims or counterclaims at issue in the arbitration.

217.    Warner's question about whether a witness had a romantic relationship with Ms. Mahn was a clear abuse of process. It served no purpose in obtaining pertinent information and was solely intended to embarrass Ms. Mahn, creating an unjust implication of a personal relationship that went beyond professional bounds, which was false in all respects.

218.    While Major, Lindsey & Africa and its minions chant their own praises to the media and press machine concerning the arbitration award they snagged, they can wear the badge of dishonor having obtained it in a secret arbitration, where Ms. Mahn had a better chance of being struck by lightning, than winning her case in a dispute with her former employer,[9] when the unfairness and lawlessness of arbitration had not yet been exposed and rejected.

219.    It was not until the arbitration was over that Ms. Mahn discovered the undisclosed complicity between AAA and Major, Lindsey & Africa, and the fundamental unfairness of its paid arbitrator Rosemary Towley ("Arbitrator Townley"), but by then, no one cared.

THE CONFLICTED ARBITRATOR

220.    During the secret arbitration that spanned almost four years from commencement to the issuance of the final award, Arbitrator Townley failed to disclose that she was one of four, solo grievance arbitrators for the National Football League ("NFL") and the NFL Players Association.

---

[9] *See*, https://www.justice.org/resources/research/the-truth-about-forced-arbitration and https://www.justice.org/resources/research/forced-arbitration-hurts-women-and-minorities (Last visited Oct. 18, 2024).

221.    While Defendants were still under the influence and control of Bisciotti, as Bisciotti was 1 of 32 NFL team owners, Arbitrator Townley failed to disclose that she was serving as an NFL arbitrator and issuing awards in favor of NFL ownership and management (including Bisciotti) prior to and during the pendency of Ms. Mahn's arbitration proceeding.

222.    Townley too failed to disclose that she and Major, Lindsey & Africa's counsel were members of the same NYSBA executive committee and tried to conceal that she knew one of its attorneys.

223.    Arbitrator Townley's fundamental unfairness directed to employees in arbitrations was not apparent online until after Ms. Mahn's arbitration had closed, when the legal decision in *Attia v Audionamix Inc.*, 2015 US Dist LEXIS 127330 (S.D.N.Y. Sep. 21, 2015, 14-CV-706 (RMB)) issued.

224.    In filing the Amended Petition to Vacate Final Arbitration Award, the employee in *Attia* argued that Arbitrator Townley "engaged in a series of misconduct concerning both a failure to disclose to Claimant her professional relationship with counsel for the Respondents, and then used Respondent's counsel's written advocacy, verbatim, in large sections, as if it were the arbitrator's own reasoning and analysis in rendering the November 5, 2013, and November 13, 2014 awards." *Id.*, Dkt. 13, p. 3.

225.    In vacating Townley's $9,051,916.81 award, the *Attia* Court held that "Arbitrator Townley's decision to strike the Affidavit was fundamentally unfair and in violation of 9 U.S.C. § 10(a)(3) and Attia obviously was prejudiced as a result."

226.    The comparison to Ms. Mahn's iniquitous experience under the guise of neutral arbitration before Arbitrator Townley is striking, as Ms. Mahn raised these very issues and others in her futile efforts in State Court to undo the punishment that Arbitrator Townley said Ms. Mahn

deserved.

227.    Arbitrator Townley's misrepresented that she was the author of the factual and legal analysis set forth in portions of the final award against Ms. Mahn, as such was taken, verbatim, from Major, Lindsey & Africa's counsel submission, and thus did not demonstrate the arbitrator's own work or analysis, yet she collected a handsome fee north of $180,000.

228.    Arbitrator Townley only publicly touted her undisclosed conflicting connections in March 2018 when her website went live, https://townleyadr.com/.

**THE SECRET LEGAL ABYSS: DEFENDANTS' TORTIOUS JOURNEY AND THE SYSTEMIC ABUSE OF PROCESS TO "DESTROY" AND "BANKRUPT" MS. MAHN.**

229.    It is utterly incredulous that Davis and Biscotti as owners throughout the relevant period of each of their ownership of Defendants, would allocate millions of dollars in their inane pursuit to obliterate and financially ruin Ms. Mahn, but that is exactly what they have done.

230.    Too, if Major, Lindsey & Africa, or Allegis recorded the judgment debt from the lawless arbitration as a bad debt, claiming, *inter alia,* no reasonable prospect of recovery, in tax filings from 2014-2019, then their continued pursuit of Ms. Mahn is a further abuse of process, seeking to collect a debt they have already deemed uncollectible in tax filings.

231.    Defendants orchestrated efforts here expose a brazen endeavor to obstruct and obscure any lawful scrutiny that might illuminate their targeted abuse of process and defamation and retaliatory conduct, all as suffered by Ms. Mahn.

232.    Toward the end of Biscotti's rein with Defendants, in October 2014, Ms. Mahn struggled to vacate the arduous arbitration award and its punishing content and effect as stroked by Townley.

233.    Major, Lindsey & Africa filed a petition to confirm and enforce the award on January 13, 2015, and its delay was purposeful, as it was salivating as New York's 9% interest

continue to run against Ms. Mahn.

234.    On June 19, 2015, a judgment was entered against Ms. Mahn, and that was appealed and affirmed on March 20, 2018.  *See*, 653048/2014, NYSCEF Doc. No. 91.

235.    Eleven months later, on February 20, 2019, Major, Lindsey & Africa's authorized agent and counsel, Ivie A. Guobadia, Esq. of Littler Mendelson P.C. (New York), issued a *Subpoena (Duces Tecum)* to Take Deposition of Judgement Debtor with Restraining Notice, to Ms. Mahn.  *Id.*  NYSCEF Doc. 73.

236.    On March 19, 2019, when Ms. Mahn's then-counsel objected to the overbroad *subpoena*, Ms. Guobadia wrote that "Ms. Mahn's refusal to appear at 9:00 a.m. and produce the documents and materials requested is, pursuant to CPLR 5251 and the New York Judiciary Law § 750 et seq., punishable as a contempt of court and could subject Ms. Mahn to either a fine, imprisonment, or both."  *Id.* NYSCEF Doc. 77.

237.    On May 24, 2019, Ms. Mahn moved to quash the overbroad *subpoena*.

238.    On April 16, 2021, Justin Edward Brown, Esq. also of the Littler Mendelsohn P.C. firm, filed on behalf of Major, Lindsey & Africa, a Notice of Motion to Punish for Contemp against Ms. Mahn. *See*, *Id.* NYSCEF 87.

239.    While Ms. Mahn was defending herself in this motion practice, Major, Lindsey & Africa branded her as a "competitive threat" (then more than 12 years after her departure) and that her submissions were "flimsy," "clumsy," and "baffling," in its effort to persuade the Court to "punish" Ms. Mahn and issue a "fining order." (Doc. No. 116, pp. 1, 3, 5).  On June 30, 2022, the Court denied the motion.  NYSCEF Doc. No. 155.

240.    On February 14, 2022, Major, Lindsey & Africa, through its authorized agent, Dimitrios Markos, Esq. of Littler Mendelson, P.C. (New Jersey), issued two *subpoenas* to Ms.

Mahn's father. *Id.* NYSCEF Doc. No. 150.

241.    On June 3, 2022, Major, Lindsey & Africa, through its authorized agent and attorney, Vita of the Shook, of Hardy & Bacon L.L.P. firm, issued an Information Subpoena and Subpoena Duces Tecum to ZRG Partners, LLC, Ms. Mahn's employer.

242.    On August 30, 2022, Vita, as agent and counsel for Major, Lindsey & Africa, issued an Information *Subpoena* with Restraining Notice to Ms. Mahn's financial institution that held her simple employee pension account.

243.    On September 8, 2022, Major, Lindsey & Africa's counsels and agents, Vita and Justin Edward Brown, Esq. of the Shook, Hardy & Bacon L.L.P., firm filed a Property Execution with the Office of the Sheriff, New York County, seeking to clean out Ms. Mahn's financial account, claiming it was not a "retirement" account (despite its name simplified employee pension account) resulting in an improper freeze on that account as well.

244.    Despite being advised that any liquidation of that account by Major, Lindsey & Africa would have subjected Ms. Mahn to early distribution penalties, it proceeded full throttle.

245.    Ms. Mahn had to expend thousands of dollars in attorney fees in her efforts to ultimately unfreeze her business operating account and her simple employee pension account.

246.    In essence, Major, Lindsey & Africa just couldn't "let it go" as its lawyers confirmed, and was all in on its wretched crusade to crush Ms. Mahn as promised.

247.    Major, Lindsey & Africa refused the pleas to leave Ms. Mahn's elderly father alone, and thus his deposition was scheduled for November 4, 2022.

248.    Ms. Mahn not only could not protect herself from the maniacal conduct of Defendants, but she was also unable to shield her family from their evil reach.

249.    The Bankruptcy Court became her sole source of sanctuary from their hateful

pursuit.

**THE NEW YORK ACTION**

250. The Summons and Verified Complaint was filed in the New York action on November 21, 2023.

251. As originally filed, the New York Action did not include the anticipated abuse of process claim filed here.

252. As Ms. Mahn had remained silent about the sexual assault she endured by Mullman during the employment arbitration, she had too remained silent because she was fearful of Bisciotti because of his comments in 2014 surrounding the Ravens/Ray Rice scandal where Bisciotti was quoted as sharing his advice "I spoke to the team and I said it is healthy to be paranoid. Every minute you're out -- when you're getting showered, when you're getting dressed -- be paranoid. Say to yourself: tonight's the night somebody is going to put me in a bad situation, or I'm going to [find] myself in [a bad situation]." *See*,

https://www.salon.com/2014/09/24/mit_frat_alumni_president_forget_rapists_drunk_female_gue sts_are_the_gravest_threat_to_fraternities/ (Last visited Oct. 31, 2024).

253. Ms. Mahn got the message, that Bisciotti (who at the time of her arbitration was still 50% owner of Allegis) thinks women lie.

254. Bisciotti leaned into that message in response to a question about increased penalties for domestic violence offenses: "You can bet there are some opportunistic people out there that are going to look at this zero tolerance place we're getting to or going to get to, and they're going to say, 'Boy, this is really, really going to be easy to threaten and get some money, because the minute I threaten him in-season, he gets cut and suspended for six games' or, like I said, as far as I'm concerned it can be a year. But when other people are then motivated to do that,

then you're going to get to a point where some people are going to be very, very falsely accused."

*See*,    https://russellstreetreport.com/2014/09/23/ravens-press-releases/steve-bisciotti-interview-the-complete-transcript/ (Last visited Oct. 31, 2024)

255.    Bisciotti's message received, that men are falsely accused and women lie.

256.    After the New York Action was filed, Major, Lindsey & Africa, LLC's counsel, Shook Hardy & Bacon LLP, upon information and belief, inquired if Major, Lindsey & Africa could "buy" the claim sounding in abuse of process that was not included in the New York Action complaint (with the obvious intent to bury it).

257.    It was only days later on December 20, 2023, that Mullman, Lindsey, Caplane, and Major, Lindsey & Africa's counsel Doyle, issued a demand letter, including the threat of sanctions, if Ms. Mahn did not withdraw her Verified Complaint.

258.    The Doyle letter attempted to mansplain the appropriate moment, in his view, for a woman, Ms. Mahn, to share publicly and allege in a verified pleading the sexual assault and battery she suffered.

259.    Defendants' abuse of process is shameful, but defaming Ms. Mahn after she was brave enough to file a lawsuit with a verified pleading in New York Supreme Court, County of New York, with claims for sexual assault and battery against Mullman and additional claims against Lindsey, Caplane, and Major, Lindsey & Africa, for their complicity in sweeping the assault under the rug, is repugnant and unlawful.

260.    Ms. Mahn stands unwavering and resolute against Defendants' intentional efforts to smear her name, tarnish her reputation, and impugn her character, in their collaborative efforts to "destroy" her, "bankrupt" her, weaponize the legal system in their abuse of its process and defame a survivor of sexual assault and battery.

261.    Defendants' collective mission extended beyond abusively dismantling Ms. Mahn's life; it aimed to divert attention from their own illicit dealings with clients, competitors, employees, and partners.

262.    Major Lindsey & Africa and Allegis, with their tainted history and pattern of sacrificing scapegoats within their organizations, strategically preyed on Ms. Mahn.

263.    Defendants operate in the shade, with no regulatory or ethical body to constrain their illicit conduct.

264.    On February 22, 2021, Shook Hardy & Bacon LLP, Patrick Kenney, Esq., took Ms. Mahn's deposition, with the supposed purpose of inquiring as to Ms. Mahn's available assets to satisfy Major, Lindsey & Africa's judgment against her.

265.    During this deposition, which lasted approximately four hours, Kenney repeatedly threatened to have or get Ms. Mahn sanctioned.

266.    Major, Lindsey & Africa then filed a motion to "punish Mahn for Contempt," (NYSCEF Doc. 89), a motion that was denied by New York State Supreme Court Justice Arlene Bluth on June 30, 2022. *See, Major, Lindsey & Africa v. Mahn*, 653048/2014, Decision and Order, June 30, 2022 (NYSCEF 155).

267.    The questioning by Kenney at Ms. Mahn's judgment creditor deposition was an abuse of process and used for the improper collateral purpose of intimidating Ms. Mahn.

268.    The judgment creditor deposition was of course attended by Allegis' lawyer Wasson, apparently not having anything better to do as Allegis' Global Counsel but to attend the judgment creditor deposition of Ms. Mahn.

269.    Major, Lindsey & Africa authorized debt collector, Kenney, used Ms. Mahn's personal Facebook post as an exhibit during the judgment creditor deposition improperly and to

continue the intimidation of Ms. Mahn.

270.    In the Facebook post that Kenney described as "disparaging", Ms. Mahn referred to her former "billion dollar company employer" and specifically called out Bisciotti as a bully.

271.    While clearly outside the scope of what is permissible in a judgment creditor deposition that should relate specifically to Ms. Mahn's assets, Kenney then pursued Ms. Mahn in questioning about why she made the social media post that referenced "#majorlindsey," and claimed in his questioning that the post was disparaging to Major, Lindsey & Africa. This too was an abuse of process.

272.    Ms. Mahn's Facebook post from August 20, 2020, that so concerned Kenney as being inappropriate reads as follows:



273.    The intent of Kenney's questioning was clear and two-fold, Major, Lindsey & Africa, and by extension, Allegis, was stalking Ms. Mahn's social media and they wanted her to know that, and more threatening, was the messaging that Ms. Mahn should abstain from any public or even private discussions of Bisciotti or Major, Lindsey & Africa, *i.e,* keep your mouth shut.

274.    Kenney's threat was not lost on Ms. Mahn.

275.    Allegis and Major, Lindsey & Africa's intent was and continues to be to stifle Ms. Mahn and her story of sexual assault so that the others too will remain silent and their respective unlawful conduct will continue unchecked.

276.    Ms. Mahn fought valiantly against Major, Lindsey & Africa, and Allegis' efforts to put her ailing elderly father in the crosshairs of their vengeance.

277.    Major, Lindsey & Africa's lawyers sought Court assistance in its bitter effort to depose Ms. Mahn's father despite Ms. Mahn's efforts to protect him from Defendants evil pursuits.

278.    It was in this moment that Ms. Mahn contemplated the wickedness of Major, Lindsey & Africa, and Allegis' intentional collateral efforts to "destroy" and "bankrupt" her, and although she had been a singular warrior, the fourteen yearlong plus battle they had waged against her had now reached beyond her person and they were targeting her family.

279.    The malicious scope on Ms. Mahn individually, and then putting her family in the lawfare zone, Major, Lindsey & Africa, and Allegis' conduct is not only pathetic but also the zenith of an abuse of process.

280.    The Machiavellian and devious behavior of these two companies, worth more than some small-world countries, finding it necessary to target Ms. Mahn's father for their own self-aggrandizement, is truly wicked and evil.

281.    Having endured Major, Lindsey & Africa, and Allegis' scavenger hunt for money, Ms. Mahn sought protection in the Bankruptcy Court as her last resort to shield herself (and by extension, her family) from their hateful pursuit.

282.    Ms. Mahn will not allow Defendants to defame her character and destroy her reputation or permit their continued abuse of process against her, Defendants are not above the

law.

## CAUSES OF ACTION

### COUNT I
#### DEFAMATION AGAINST MAJOR, LINDSEY & AFRICA

283.    Ms. Mahn incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

284.    Major, Lindsey & Africa, through its "authorized spokesperson," and its agents, published to The American Lawyer a defamatory *per se* statement concerning Ms. Mahn for the purpose of, and with the knowledge that, its false statement would be published by the media outlet.

285.    Major, Lindsey & Africa's defamatory quoted statement was in fact published in quotes on November 22, 2023, by The American Lawyer and available for viewing on Law.com containing the defamatory *per se* statement that Ms. Mahn "may be forced to repay the millions of dollars she stole from MLA and her colleagues."

*See*, https://www.law.com/americanlawyer/2023/11/22/major-lindsey-africa-leaders-turned-blind-eye-to-sexual-assault-suit-alleges/?slreturn=2024102995518.

286.    Major, Lindsey & Africa's statement was false.

287.    Major, Lindsey & Africa's spoken statement on the whole can be construed as Major, Lindsey & Africa falsely accusing Ms. Mahn of stealing "millions of dollars" to deflect the verified allegations Ms. Mahn pled in the New York Action against it, including that it had harbored a predator in its ranks.

288.    Major, Lindsey & Africa's false statement is defamatory *per se* because it affected Ms. Mahn in her profession by falsely imputing her theft, dishonesty, and/or misconduct.

289.    Ms. Mahn, a licensed attorney, depends on her clients' reliance on her steadfast

honesty and fulsome integrity – qualities vital to her profession, not false accusations of theft.

290.    Ms. Mahn is on the Board of Trustees of her *alma mater*, she teaches at New York University as a guest lecturer, she serves on non-profit boards, all with an unblemished career as a lawyer.

291.    Defendants defamatory statements, made with improper collateral objective to humiliate and defame Ms. Mahn and deflect from the verified allegations of the New York Action, unlawfully impugned her character and falsely accused her of theft.

292.    Major, Lindsey & Africa's false statement identified and was "of or concerning" Ms. Mahn.

293.    Major, Lindsey & Africa's statement contained falsehoods about Ms. Mahn, whether on its face and/or by virtue of a clear implication affirmatively intended by Major, Lindsey & Africa.

294.    Major, Lindsey & Africa's false statement regarding Ms. Mahn was defamatory *per se*.

295.    Major, Lindsey & Africa gave its false and defamatory statement knowing it would be published in The American Lawyer and available on Law.com, a website from ALM (American Lawyer Media) and was published therein on November 22, 2023, which has, upon information and belief, total print readership of 400,000 and an average of 1.58 million unique visitors per month.

296.    Major, Lindsey & Africa made its false and defamatory statement knowing that it was false or with reckless disregard for its truth or falsity.

297.    Major, Lindsey & Africa made its false statement with ill will and spite, and with wanton, reckless, or willful disregard for its injurious effects on Ms. Mahn and her rights.

298.   Major, Lindsey & Africa's false and defamatory statement was made as retaliation for Ms. Mahn's filing of the New York Action and meant to cause Ms. Mahn to suffer reputational, emotional, and professional harm.

299.   Major, Lindsey & Africa's false statement exposed Ms. Mahn to public contempt, hatred, ridicule, aversion, and/or disgrace, falsely brandishing her as a thief.

300.   Major, Lindsey & Africa's false statement was meant as a statement of fact.

301.   Major, Lindsey & Africa's statement is deliberately false and literally unprovable; it is not pertinent, relevant or material to anything because it is a lie, Ms. Mahn has never "stolen" "millions of dollars" from Defendants.

302.   Ms. Mahn's integrity is beyond reproach rendering Major, Lindsey & Africa's defamatory statement against her in its never-ending marketing and press machine (the *modus oporendi* is to attack the former female survivor) to conceal the fact that they harbored a predator within their ranks, Mullman, is scandalous, specious and unlawful.

### COUNT II
#### *DEFAMATION AGAINST DEFENDANTS*

303.   Ms. Mahn incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

304.   Major, Lindsey & Africa authorized agents, Doyle and Goldstein, literally lied in its March 11, 2024 submission to the New York State Supreme Court (NYSCEF Doc. No. 67), falsely stating that Ms. Mahn engaged in "criminal conduct," a fact that is in all events false, and constitutes defamation *per se* while it sought to stuff Ms. Mahn's sexual assault and related claims in a forced arbitration and to evade the consequences of their collaborative unlawful conduct, hoping to tip the scales of justice with their falsifications to deter any meaningful investigation into the claims pled in the Verified Complaint in the New York Action.

305.    Although Lindsey, as an attorney admitted to the New York Bar and who claims to be a former federal prosecutor, and Wasson, admitted to practice law under the Maryland Bar, surely know the difference between civil conduct and criminal conduct, upon information and belief, each authorized their lawyers, Doyle and Goldstein, to refer to Ms. Mahn as having engaged in "criminal conduct."

306.    It is alleged, upon information and belief, that Wasson, as Allegis' authorized agent, and Doyle and Goldstein, as Major, Lindsey & Africa's authorized agent, reviewed and approved the falsified and defamatory filing against Ms. Mahn prior to its filing and publication on March 11, 2024.

307.    None of the Defendants, nor their counsel, can cloak themselves behind the absolute privilege that would otherwise attach to a judicial filing, as the words they intentionally stroked, "criminal conduct," and used were not pertinent, material or relevant in any way to the New York Action, and were so needlessly defamatory and warrant the factual inference of express malice, that strips away any semblance of protection afforded by any privilege, laying bare their liability to the claims advanced herein for defamation.

308.    *Youmans v Smith*, 153 NY 214, 220 (1897) remains good law in New York.

309.    The New York Court of Appeals in *Youmans* confirmed, in relevant part, "If counsel through an excess of zeal to serve their clients, or in order to gratify their own vindictive feelings, go beyond the bounds of reason and by main force bring into a lawsuit matters so obviously impertinent as not to admit of discussion, and so needlessly defamatory as to warrant the inference of express malice, they lose their privilege and must take the consequences. In other words, if the privilege is abused, protection is withdrawn."

310.    Defendants' approved statement identified and was "of or concerning" Ms. Mahn.

47

311.    Defendants' statement contained falsehoods about Ms. Mahn, whether on its face and/or by virtue of a clear implication affirmatively intended by Defendants.

312.    Defendants' false statement regarding Ms. Mahn was defamatory *per se*.

313.    Defendants' false statement was meant as a statement of fact.

314.    Defendants inked its false and defamatory statement knowing it would be published on the Court NYSCEF docket, and wildly available to the public.  Specifically, having already given the press its November 2023 defamatory statement, Defendants knew that the media was following the New York Action filings.

315.    Defendants made their false and defamatory statement knowing that it was false or with reckless disregard for its truth or falsity.

316.    Defendants made their false statement with ill will and spite and with wanton, reckless, or willful disregard for its injurious effects on Ms. Mahn and her rights.

317.    Defendants' false and defamatory statement caused Ms. Mahn to suffer reputational, emotional, and professional harm.

318.    Defendants' statement is deliberately false and literally unprovable*;* Ms. Mahn has never, ever, been accused of "criminal conduct."

319.    Defendants' false statement exposed Ms. Mahn to public contempt, hatred, ridicule, aversion, and/or disgrace.

320.    Defendants have defamed Ms. Mahn, and any effort to cloak their defamation in the robes of litigation privilege will fail, as they are not entitled to any such exception, as their ink has been penned with malice intent to harm and defame Ms. Mahn.

### COUNT III
### *ABUSE OF PROCESS AGAINST DEFENDANTS*

321.    Ms. Mahn incorporates by reference all preceding paragraphs and re-alleges them

as if set forth fully herein.

322.    The New York Action is a regularly issued civil process.

323.    Defendants' defamatory statements identified *supra* were made by Defendants (or their authorized agents) with the intent to do Ms. Mahn harm without legal excuse or justification.

324.    Defendants defamatory statements identified *supra* were used in the civil process in a perverted manner to obtain a collateral objective, to harm, humiliate, and forever tarnish Ms. Mahn's reputation by falsely writing on March 11, 2024, that Ms. Mahn engaged in "criminal conduct."

325.    Defendants' filing of the defamatory statement was for an improper purpose to cause Ms. Mahn specific injury outside the normal contemplation of private litigation.

326.    Defendants' defamatory statement that a licensed attorney engaged in criminal conduct is defamation *per se* and was stroked intentionally.

327.    Defendants' filing was deliberately false and literally unprovable.

328.    Defendants' improper use of the civil process after Ms. Mahn filed her Verified Complaint in the New York Action was purposeful and an unlawful effort to interfere and impugn her person with harmful content.

329.    Defendants' improper use of the civil process after Ms. Mahn filed her Verified Complaint in the New York Action was purposeful and an unlawful effort to interfere with and impugn her reputation and her livelihood.

330.    Defendants' authorized counsel engaged in unlawful abuse of process when it signed the memorandum of law that contained the falsified statement, under New York Rule 130, by its signature "an attorney or party certifies that, to the best of that person's knowledge, information and belief, formed after an inquiry reasonable under the circumstances, (1) the

presentation of the paper or the contentions therein are not frivolous as defined in section 130-1.1(c)," conduct is *per se* frivolous where "(1) it is completely without merit in law and cannot be supported by a reasonable argument for an extension, modification or reversal of existing law; (2) it is undertaken primarily to delay or prolong the resolution of the litigation, or to harass or maliciously injure another; or (3) it asserts material factual statements that are false."

331.    Defendants' defamatory statement that Ms. Mahn engaged in "criminal conduct" is false, was interposed to harass and maliciously injure Ms. Mahn, was asserted as a material statement that was false, and thus by definition was frivolous, and an abuse of process.

332.    Defendants intended to harm Ms. Mahn by demeaning, humiliating, and defaming her rather than to secure justice in the New York Action.

333.    Defendants made the false and abusive statement as retribution against Ms. Mahn for filing her sexual assault and sexual battery and related claims in the New York Action.

334.    Defendants abused the process with the improper and intentional purpose of damaging Ms. Mahn's reputation in the eyes of her clients and prospective clients for placements and the law firm partners she works with (as Ms. Mahn is, according to Kenney, "competing" with Major, Lindsey & Africa) and to harass Ms. Mahn.

335.    Defendants were unlawfully manipulating the civil process to achieve an improper collateral objective, *i.e.*, demeaning, humiliating, and defaming Ms. Mahn in an attempt to gain an advantage in the sexual assault and sexual battery lawsuit by falsely branding Ms. Mahn as a having engaged in "criminal conduct."

336.    Defendants and its lawyer agents owed Ms. Mahn a duty not to shamelessly lie in the civil process, and lying is an abuse of the civil process.

337.    Ms. Mahn has been damaged, including special damages, having incurred costs and

attorney's fees and costs specifically related to Defendants' abuse of process.

**COUNT IV**

***NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS AGAINST DEFENDANTS***

338.    Ms. Mahn incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

339.    Ms. Mahn has alleged here, the longstanding campaign of deliberate, systematic, and malicious harassment of her person as a result of Defendants' unlawful hunt and effort to "destroy" and "bankrupt" as promised by Allegis' lawyer in 2009.

340.    Defendants (and their authorized agents) inflicted through deliberate and malicious campaign of harassment and intimidation all of the following between 2009 and 2024: sued Ms. Mahn in federal court for bogus RICO and computer fraud and abuse claims and then withdrew them after they got the media splash they wanted, filed an arbitration proceeding that was premised on Major, Lindsey & Africa's now debunked claim that its attorney "job seekers" information constitute confidential information (as it has admitted in two judicial filings referenced *supra*), threatened to take the deposition of Ms. Mahn's father (despite having no legally rational basis to do so), repeatedly threatened Ms. Mahn with sanctions (as a lawyer, such is especially menacing), issued improper debt collector *subpoenas* that resulted in Ms. Mahn's business operating account to be improperly frozen and her simple employee pension account to be frozen as well, shamed and retaliated against Ms. Mahn for filing the New York Action, retaliated in defaming her, lied and stated she had engaged in criminal conduct and branded her a thief in its false statement that she stole millions of dollars.

341.    Defendants' harassment and humiliating efforts to destroy Ms. Mahn are outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community, being hunted and

defamed and humiliated by the billionaires, Defendants here, for more than 15 years, is by definition outrageous.

342.    Ms. Mahn has lost income and suffered psychological and emotional harm over the entire 15 years through Defendants' various specified acts, deliberately, systematically, and maliciously harassing her with a stated purpose to "destroy" and "bankrupt" her.

343.    While these allegations likely reach the heightened standard of intentional infliction of emotional distress, Ms. Mahn pleads them under the lower standard required for negligent infliction of emotional distress.

344.    Defendants' unlawful conduct here created an unreasonable risk of causing Ms. Mahn emotional distress, Defendants' acts were purposeful and Ms. Mahn's distress was foreseeable, Defendants and their agents owed Ms. Mahn a duty not to lie in Court filings or defame her in retaliation for filing her New York Action under the Adult Survivors Act, Ms. Mahn's emotional distress was severe enough that it resulted in Ms. Mahn being physically ill, sick, caused Ms. Mahn to have a traumatic health issue, and Defendants repeated and excessive unlawful conduct was the direct cause of Ms. Mahn's emotional distress.

### PRAYER FOR RELIEF

**WHEREFORE**, Sharon Mahn respectfully requests that the Court:

  i.    Order Defendants to retract their defamatory statements;

 ii.    Award Sharon Mahn compensatory damages in an amount to be determined at trial in an amount of not less than Twenty Five Million Dollars ($25,000,000);

iii.    Award Sharon Mahn punitive and exemplary damages in an amount to be determined at trial; and

iv.  Award Sharon Mahn pre- and post-judgment interest, costs, and such other

and further relief as this Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff Sharon Mahn hereby demands a trial by jury on all issues so triable pursuant to

Rule 38 of the Federal Rules of Civil Procedure.

Dated: November 1, 2024
      New York, New York

                                     Respectfully submitted,
                                     Brazzano Law PLLC

                                     /s/ Rebecca Brazzano
                                     Rebecca Brazzano
                                     43 West 43rd Street, Ste. 264
                                     New York, NY 10036
                                     RBrazzano@BrazzanoLaw.com
                                     (516) 365-3812
                                     *Attorneys for Sharon Mahn*

## VERIFICATION

I, **SHARON MAHN**, of full age, deposes and says, pursuant to 28 U.S. Code § 1746:

1. I have personal knowledge of the allegations of the within Verified Complaint.

2. I have read the foregoing Verified Complaint and know the contents thereof. The same are true to my knowledge, except as to matters therein stated to be alleged upon information and belief, and as to those matters, I believe them to be true.

3. I hereby verify under penalty of perjury that the foregoing is true and correct. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment by law.

Executed On: November 1, 2024     *Sharon Mahn*
                  SHARON MAHN